

**IT IS ORDERED as set forth below:**

**Date: September 27, 2023**

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 22-52999-WLH |
| JUDY DAWN CRAWFORD, | CHAPTER 7 |
| Debtor. | |
| IN RE: | ADVERSARY PROCEEDING |
| MICHAEL SMITHYMAN, | NO. 22-5112 |
| Plaintiff, | |
| v. | |
| JUDY DAWN CRAWFORD, | |
| Defendant. | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**THIS MATTER** objecting to Defendant's discharge and dischargeability of debt is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 13) (the "Motion"), and Plaintiff's response filed in opposition thereto (Doc. No. 20). This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 157(b)(2)(J), and the Court has jurisdiction over the proceeding pursuant to 28 U.S.C. §§ 1334 and 157 .

## I.    **FACTS**

### A.    **Failure to Respond to Statement of Undisputed Facts**

Defendant attached a Statement of Undisputed Facts to the Motion as required by Bankruptcy Local Rule 7056-1(a)(1). Plaintiff, however, did not respond to the statement as required by Bankruptcy Local Rule 7056-1(a)(2). Instead, Plaintiff attached "Questions of Fact for a Jury to Decide." Discharge proceedings in bankruptcy court are not jury trials, but bench trials. In re Duffy, 317 B.R. 49, 51 (Bankr. D. R.I. 2004). This document is not a response to Movant's statement of facts, nor a statement of contested facts because it is all questions.

The Court must consider Plaintiff's failure to respond to Defendant's Statement of Material Facts (Doc. No. 14). Federal Rule of Civil Procedure 56(e) provides a court may consider a fact undisputed for purposes of summary judgment when a party fails to support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c). Fed. R. Civ. P. 56(e)(2); see, e.g., Ehrlich v. Global, 2017 WL 2633528, at *2 nn.3–4 (N.D.N.Y. June 19, 2017). Many local rules, including those applicable here, also deem uncontroverted facts admitted for summary judgment purposes. Bankruptcy Local Rule 7056-1(a)(2) provides "[a]ll material facts contained in the moving party's statement that are not specifically controverted in respondent's statement are deemed admitted." BLR 7056-1(a)(2). Bankruptcy local rules "have the force of law," In re Milani, 2019 WL 4584152, at *3 (Bankr. N.D. Ga. Sept. 19, 2019) (citations omitted),

and failure to comply with such local rules "is not a mere technicality." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009). When a responding party fails to comply with applicable local rules requiring a specific response, and the moving party's undisputed facts are therefore deemed admitted, "a district court [is] to disregard or ignore evidence relied on by the respondent—but not cited in the movant's statement of undisputed facts—that yields facts contrary to those listed in the movant's statement." Garmley v. Cochran, 651 F. App'x 933 , 937 (11th Cir. 2016) (alteration in original) (quoting Reese v. Herbert, 527 F.3d 1253 , 1268 (11th Cir. 2008)).

Deeming facts admitted, however, does not automatically entitle the movant to summary judgment. After deeming the movant's statement of undisputed facts to be admitted, the "court must then review the movant's citations to the record to 'determine if there is, indeed, no genuine issue of material fact.'" Reese, 527 F.3d at 1269 (quoting U.S. v. One Piece of Real Prop. Located at 5800 SW 74th Ave., 363 F.3d 1099, 1103 n.6 (11th Cir. 2004)). That is because facts are only "deemed admitted . . . to the extent [that they are] supported by specific references to the [record]." One Piece of Real Prop. Located at 5800 SW 74th Ave., 363 F.3d at 1103 n.6 (alteration in original); see also Aponte v. Royal Caribbean Cruise Lines Ltd., 739 F. App'x 531, 535 (11th Cir. 2018). Therefore, while undisputed material facts are deemed admitted to the extent they are supported by evidentiary materials, the Court has an obligation to determine whether the evidentiary materials create any issues of material fact and should not blindly accept such undisputed facts as true. King v. Skolness, 624 B.R. 259, 276 (Bankr. N.D. Ga. 2020).

### B.  Undisputed Facts

Overview

On December 29, 2017, Wild Rose Management, Inc. ("Wild Rose") sold a franchised residential and commercial cleaning business under the trade name "Maid Brigade" to RRJ

3

Unlimited, Inc. ("RRJ"). RRJ executed a note to Wild Rose in the principal amount of $200,000 payable in 120 monthly payments beginning March 15, 2018.  Judy Crawford ("Defendant"), who was the president of RRJ, executed a guaranty of RRJ's note.  On January 1, 2019, Wild Rose assigned the note, guaranty, and other operative documents to Michael Smithyman ("Plaintiff"), who was its president.

RRJ soon struggled to make the payments, so Wild Rose re-amortized the repayment schedule in August 2018 to lower the monthly payments. The onset of the 2020 pandemic caused RRJ to reduce monthly payments further. By 2021, RRJ decided that the business could not continue. RRJ wound down in late 2021 and early 2022 by donating, selling, or not replacing its assets, and storing other assets.

Defendant filed a voluntary petition for Chapter 7 bankruptcy on April 19, 2022. She scheduled Wild Rose as having a $180,000 unsecured claim. Defendant later amended her Schedule D to reflect Wild Rose's claim as being secured by remaining business assets valued at $100. Plaintiff filed this adversary proceeding on August 4, 2022 to challenge the dischargeability of its debt and Defendant's discharge.

The Sale and Sale Documents

In connection with the sale of the Maid Brigade franchise, Wild Rose and RRJ executed a number of documents including:

(1) the Asset Purchase Agreement ("APA"),
(2) a Non-Competition, Non-Solicitation and Non-Disclosure Agreement (referred to as "Seller's Covenants" by Plaintiff) from Wild Rose and Plaintiff,
(3) a Promissory Note from RRJ to Wild Rose,
(4) a Security Agreement from RRJ to Wild Rose,
(5) a Personal Guarantee of Defendant and Defendant's father, Robert C. Cadenhead, to Wild Rose,
(6) a Bill of Sale from Wild Rose to RRJ dated December 31, 2017,
(7) four certificates of title to four vehicles executed in blank by Wild Rose, and

4

(8) a UCC Financing Statement showing RRJ, Defendant, and Cadenhead as debtors and Wild Rose as secured party that was filed with the Clerk of the Superior Court of Cobb County on January 9, 2018.

The APA provided that RRJ (as purchaser) purchased from Wild Rose (as seller) the following assets:

> all right, title and interest in and to the going Business identified above, including, without limitation, all materials, fixtures, furniture, equipment, files and records, telephone and facsimile numbers, Internet Website and URL address, social media sites, customer and supplier files, information, lists and contracts, supplies and inventory, and any other assets owned by Seller, situated at the location set forth above (collectively, the "Assets") as owned by Seller and used in conjunction with the Business and as more particularly set forth in Exhibit "A" attached hereto and hereby incorporated by reference.

However, no Exhibit A is included in the record. With respect to fixed assets, furniture, and equipment, the APA describes them as "[a]ll of Seller's fixed assets, property, equipment, furniture and fixtures, set forth in Exhibit 'A-2,' attached hereto and incorporated by reference[.]" Again, no Exhibit A-2 is in the record. But the APA allocated the $200,000 purchase price paid by RRJ as follows: $20,000 for furniture, fixtures, and equipment; $24,000 for vehicles; $3,000 for records, supplies, and inventory; $1,000 for covenants; and $152,000 for goodwill. In her affidavit, Defendant describes property purchased with the business including "Four Kia Souls [that] were transferred with the business."

The Promissory Note required monthly payments of $2,342.21 and provided for a late fee of 5% for each payment over five days late. The Note also permitted recovery of attorney's fees and reasonable costs of collection. Finally, the Note provided for a 10% prepayment fee.

RRJ executed a Security Agreement at closing whereby it (as the named debtor) purported to provide Wild Rose a security interest in all business assets, then existing and thereafter acquired. Specifically, the security agreement purported to secure the Note with:

5

> All materials, fixtures, furniture, equipment, files, and records, telephone and facsimile numbers, customer and supplier files, information, lists and contracts, supplies and inventory, leases, registrations and other contracts; telephone and facsimile numbers; Internet and social media website and addresses; service marks, trademarks and trade names; franchise rights; goodwill; revenues, accounts receivables, cash reserves, securities and investment assets; and all other assets of Debtor now owned or becoming the property of Debtor while amounts are due and owing under the above-described Note, whether now existing or hereafter arising, together with all proceeds received from the foregoing (the "Security").

The APA, Article VIII, and Security Agreement ¶6 required RRJ to procure a term life insurance policy on Defendant's life with a cash payout amount of at least $200,000 to the benefit of Plaintiff. None of the APA, the Security Agreement, nor the Promissory Note required or even mentioned a policy on the life of Mr. Cadenhead.

A UCC-1 Financing Statement was recorded with the Clerk of the Superior Court of Cobb County on January 9, 2018. The Financing Statement identifies RRJ, Defendant, and Mr. Cadenhead as the Debtors and Wild Rose as the secured party. The Financing Statement identified and covered the following collateral:

> All materials, fixtures, furniture, equipment, files and records, telephone and facsimile numbers, customer and supplier files, information, lists and contracts, supplies and inventory, leases, registrations and other contracts; telephone and facsimile numbers; Internet and social media website and addresses; service marks, trademarks and trade names; franchise rights; goodwill; revenues, accounts receivables, cash reserves, securities and investment assets; and all other assets of Debtors now owned or becoming the property of the Debtors, whether now existing or hereafter arising, together with all proceeds received from the foregoing.

<u>Defendant's Payment History</u>

RRJ or Defendant paid $2,500 for each of the first five payments on March 14, 2018; April 23, 2018; May 29, 2018, June 25, 2018; and July 31, 2018.

In August 2018, Wild Rose and RRJ re-amortized the Note to reflect RRJ's struggles to make the payments. Payments of $1,000 per month were required starting in September 2018.

6

Monthly payments were to increase to $1,250 in February 2019. From then on, payments would

increase in $250 increments every six months until they reached $3,000 in August of 2022. The

payments would remain $3,000 until the note was paid.

RRJ or Defendant made the following payments over the remainder of 2018 and 2019:

$1,000 on September 25, 2018;
$1,000 on November 7, 2018;
$1,000 on November 29, 2018;
$1,000 on December 2, 2018;
$1,000 on December 21, 2018;
$1,000 on January 28, 2019;
$1,250 on March 22, 2019;
$2,525 on April 22, 2019;
$1,250 on May 21, 2019;
$1,250 on June 21, 2019;
$1,250 on July 31, 2019;
$1,500 on August 21, 2019;
$1,500 on September 23, 2019;
$1,500 on November 21, 2019;
$1,500 on December 24, 2019.

The 2020 COVID-19 pandemic greatly affected RRJ's business and its revenue. RRJ or

Defendant made the following payments in 2020 totaling $8,700:

$300 on February 11, 2020;
$300 on February 19, 2020;
$300 on February 20, 2020;
$300 on March 2, 2020;
$600 on March 4, 2020;
$600 on May 13, 2020;
$1,300 on July 8, 2020;
$1,300 on August 20, 2020;
$1,300 on September 20, 2020;
$1,300 on October 22, 2020;
$1,300 on November 19, 2020.

In 2021, Defendant made sporadic payments totaling $5,600. The total payments made to

Plaintiff were $46,325.

At some point in 2021, Defendant realized that she was not going to be able to continue operating the business. In late 2021 and early 2022, she wound down the business. Many of the items she received with the business wore out over time and were either replaced or disposed of. Some supplies were simply not restocked. Defendant sold some items, and she threw away or donated to Goodwill other items that were too old or worn out to sell.

In her sworn affidavit, schedules, and SOFA, Defendant listed the following items she received with the business and what happened to them:

A. An old wooden desk that was too large for the office was donated to Goodwill after an unsuccessful attempt to sell it;

B. An old couch became infested with bedbugs and was disposed of after unsuccessful treatment;

C. Miscellaneous office chairs, which were left in poor condition, were either disposed of or donated to Goodwill depending on their condition;

D. Two extremely worn washers and two extremely worn dryers wore out with use and were donated to Goodwill after they stopped cleaning effectively; they were replaced with four newer units. These were sold for $1,000 to an unnamed buyer;

E. Two office printers were replaced during the course of the business;

F. Wooden and plastic bookshelves left in the office were retained and are in storage;

G. Three metal storage cabinets were retained and are in storage;

H. An old metal cleaning fluid station was replaced by Maid Brigade Inc. during COVID-19 because the parent company mandated a switch to electrolized water cleaning; this new system is in storage;

I. Four commercial vacuum cleaners were replaced as they wore out and parts stopped working; the four replacements were severely worn down and two were sold to Sally Pearson for $175 and Gloria Laplante for $275. The other two were retained and are in storage;

J. Miscellaneous office equipment – folders, markers, paper, rubber bands, envelopes – were used in the course of the business and as the business was winding down were not replaced;

K. Miscellaneous cleaning supplies – bank bags, mops, mop poles, buckets – were used in the course of the business and were discarded as they wore out. They were not replaced as the business was winding down;

L.  Employee uniforms – these were changed out for new ones when Maid Brigade, Inc., changed their logo and trade dress. When the business was winding down, most of these uniforms were not returned as employees kept or lost their shirts or aprons;

M.  Various structural storage devices had been built-in to the rented office unit and were left with the unit when the business closed down;

N.  Based on Maid Brigade, Inc. recommendations, several portable steam cleaners were purchased.  Most of these were returned, one was retained and is still in storage;

O.  A ScanSnap document scanner was retained and is in storage;

P.  Four Samsung tablets and five phones are in storage.

Finally, it is undisputed Wild Rose signed title to four Kia Souls in blank. No liens were indicated on the titles. No evidence in the record reflects in whose name the vehicles were titled, but the APA assigns a value of $24,000 to them as part of the purchase price paid by RRJ, and Defendant says they were "transferred with the business." It is also undisputed that Defendant sold three Kia Souls to Carmax on February 18, 2022. Defendant received $6,000 for the 2014 Kia Soul with VIN KNDJN2A21E7741712; $5,000 for the 2012 Kia Soul with the VIN KNDJT2A57C7473617; and $5,000 for the 2012 Kia Soul with the VIN KNDJT2A55C7449669. Defendant states the fourth vehicle was totaled in an accident by an employee. Plaintiff does not dispute this fact. No further details are provided on this vehicle.

On August 13, 2021, Plaintiff's counsel sent a letter to RRJ, Defendant, and the estate of Mr. Cadenhead notifying them of the default under the Note and demanding payment of life insurance proceeds on Mr. Cadenhead in the amount of $70,000.

### C.  Adversary Proceeding

Plaintiff filed the verified Complaint on August 4, 2022, alleging fraudulent transfer and fraud in the inducement. The Complaint references sections 523(a)(2)(A), 523(a)(4), 523(a)(7), 727(a)(3), 727(a)(4), and 727(a) of the Bankruptcy Code. Plaintiff seeks a judgment against

Defendant in the principal amount $195,830.27 plus interest ($40,561.01), late fees ($78,493.82), fees and costs ($2,475.08), and attorney's fees.

Defendant filed the Motion on March 24, 2023. Plaintiff responded on May 31, 2023 (Doc. No. 20).[1]

### D.  The Parties' Arguments

Movant argues she is entitled to summary judgment because the undisputed facts provide no basis to deny her a discharge under section 727 or to find Plaintiff's claim nondischargeable under the cited sections of 523. She argues the Complaint advances two theories of fraud: 1) that Defendant transferred secured assets of the business for her own personal use and 2) that Defendant fraudulently induced Plaintiff to enter into the APA. Defendant maintains that neither the APA nor any other documents contained a requirement for insurance to be purchased on the life of Mr. Cadenhead, so a failure to obtain such insurance is not fraudulent. Defendant also argues that the disposition of the business assets was not fraudulent, either actually or constructively, because she obtained fair market value for the assets when she disposed of them and used the proceeds to pay business debts and personal debts incurred in connection with the business. Defendant contends the vehicles are not collateral of Plaintiff so disposition of the vehicles is not a basis to deny her a discharge. Defendant asserts the Complaint alleges no facts to support a claim of fraud in the inducement or false pretenses other than the failure of the Defendant or RRJ to pay the Note. Finally, Defendant argues that the allegations in the Complaint are not specific as to any violation of section 727 and that Plaintiff alleges the application of sub-sections of section 523 that do not apply.

---

[1] Defendant filed a Motion to Strike Plaintiff's Reply (Doc. No. 24), which the Court denied on June 29, 2023 (Doc. No. 27).

Plaintiff responds that Defendant is liable for a fraudulent transfer because Defendant transferred secured assets of RRJ for less than fair market value, transferred secured assets of RRJ and retained the proceeds for personal use, transferred secured assets of RRJ and failed to use the proceeds to satisfy the debt owed to Plaintiff, transferred secured assets of RRJ without the prior knowledge or consent of Plaintiff, and transferred secured assets while insolvent and within 90 days of the petition. Plaintiff contends it was granted a security interest in the vehicles, but further that a perfected lien on the vehicles is not necessary to find the Defendant fraudulently disposed of the collateral. Plaintiff argues that Defendant's intent in taking these actions is disputed and sufficient to bar the grant of summary judgment.

## II.   <u>SUMMARY JUDGMENT</u>

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 , made applicable to contested matters by Federal Rules of Bankruptcy Procedure 7056 and 9014. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c) ; Fed. R. Bankr. P. 7056(c). "The substantive law [applicable to the case] will identify which facts are material." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden of proving there are no disputes as to any material facts. <u>Hairston v. Gainesville Sun Pub. Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. The party moving for summary judgment has "the initial responsibility of informing the . . . court of [the] basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (citing Celotex Corp., 477 U.S. at 323). What is required of the moving party, however, varies depending on whether the moving party has the ultimate burden of proof on the issue at trial.

> When the nonmoving party has the burden of proof at trial, the moving party is not required to "support its motion with affidavits or other similar material negating the opponent's claim" (cites omitted) in order to discharge this "initial responsibility".

> Instead, the moving party simply may "show - that is, point out to the . . . court - that there is an absence of evidence to support the nonmoving party's case." (cites omitted). Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.

Id. at 1437–38  (citing Celotex, 477 U.S. at 323–31).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts that demonstrate there is a genuine dispute over material facts. Hairston, 9 F.3d at 918. When reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. Id.

### III.    Determination of Nondischargeability

Plaintiff seeks a determination that it has a nondischargeable claim. A presumption exists all debts owed by the debtor are dischargeable unless the party contending otherwise proves nondischargeability by a preponderance of the evidence. 11 U.S.C. § 727(b); Grogan v. Garner, 498 U.S. 279, 287–88 (1991); St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 680 (11th Cir. 1993). The purpose of this "fresh start" is to protect "honest but unfortunate" debtors. U.S. v.

Fretz (In re Fretz), 244 F.3d 1323, 1326 (11th Cir. 2001). Exceptions to discharge are, therefore, narrowly construed against the creditor and in favor of the debtor. Equitable Bank v. Miller (In re Miller), 39 F.3d 301 (11th Cir. 1994); St. Laurent, 991 F.2d at 680. Moreover, a claim is nondischargeable only if it was obtained by one of the causes identified in section 523. In re Castaneda, 638 B.R. 737, 745 (Bankr. S.D. Tex. 2022); In re Melcher, 319 B.R. 761, 773 (Bankr. D. D.C. 2004).

Determining whether a debt is nondischargeable is a two step-process. Hurston v. Anzo (In re Anzo), 547 B.R. 454, 464 (Bankr. N.D. Ga. 2016). The first step is to determine whether a claim exists or can be maintained under state or non-bankruptcy federal law. In re Dopson, 2018 WL 2021247, at *2 (Bankr. N.D. Ga. Apr. 27, 2018) (citing Smith v. Smith (In re Smith), 495 B.R. 291, 297 (Bankr. N.D. Miss. 2013)). Only after it is determined that a claim exists or can be maintained does the second step—determining nondischargeability—come into play. Id.

Here, Plaintiff's claim arises first under contract for Defendant's failure to pay under her guaranty. Plaintiff's other claims are not well defined as legal causes of action. The Court will do its best to interpret Plaintiff's allegations as claims. Plaintiff alleges Defendant disposed of the assets of RRJ improperly. Since the assets disposed of were allegedly those of a corporation, Plaintiff's claim must arise because of Defendant's acts as the president of that corporation. Such a claim, though, would be limited to the value of the assets improperly transferred, not the total contractual debt. Next, Plaintiff alleges Defendant used some of the proceeds from RRJ's assets for personal use. Such a claim, again, would be limited to the amount wrongfully transferred to Defendant, and not the entire contractual debt. Finally, Plaintiff alleges in the Complaint a claim of fraud in the inducement. Plaintiff references sections 523(a)(2)(a), (a)(4), and (a)(7).

The Court will examine Plaintiff's claims to determine if disputed facts remain as to the dischargeability of any of them, keeping in mind that the Plaintiff (not the Defendant) has the burden of proof and must have identified for the Court the parts of the record creating a genuine issue of fact.

### A.  Contract Claim

Plaintiff contends Defendant breached the underlying contracts by not paying the sums due and not providing life insurance on Mr. Cadenhead.

Defendant did not breach any agreement regarding life insurance on Mr. Cadenhead, however, because none was required. While Plaintiff alleges RRJ agreed to maintain a life insurance policy, there is no evidence to support this contention. The APA and Security Agreement required RRJ to procure a term life insurance policy on Defendant's life with a cash payout amount of at least $200,000 to the benefit of Plaintiff. The APA, the Security Agreement, and the Promissory Note did not require a policy on the life of Mr. Cadenhead. The only suggestion in the record of a life insurance policy on Mr. Cadenhead appears in Plaintiff's 2021 notice of default which demanded $70,000 of insurance proceeds from the death of Mr. Cadenhead, which is not supported by any of the underlying documents. When a motion for summary judgment is properly made and supported, an opposing party may not simply rely on allegations or denials in its own pleadings, but must, by affidavits or otherwise, set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). Plaintiff has failed to present any evidence to create a genuine issue of material fact as to Defendant's obligation to obtain life insurance on Mr. Cadenhead for Plaintiff's benefit.

It is undisputed that Defendant breached the guaranty by not paying the sums due under it. A breach of contract, however, does not render a debt nondischargeable. Section 523(a)(2)(A)

excepts from discharge claims for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." 11 U.S.C. § 523(a)(2)(A). "Not all frauds are included within the exception of section 523(a)(2)(A), but only those involved in the obtaining of money, property, or services" by false pretenses, false representations, and actual fraud. Smith v. Smith (In re Smith), 489 B.R. 875, 886 (Bankr. M.D. Ga. 2013).

Plaintiff alleges he was fraudulently induced by Defendant to enter into the sale of the business. The tort of fraudulent inducement under Georgia law has five elements: "a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff." JPMorgan Chase Bank, N. A. v. Durie, 350 Ga. App. 769, 771 (2019) (citing Stafford v. Gareleck, 330 Ga. App. 757, 762 (2015)). A key element of fraudulent inducement is a "false representation by a defendant." Id.; see also Wall v. Century 21 Winnerville Realty, 244 Ga. App. 762, 763–764 (2000). The elements of a fraudulent inducement claim under Georgia law mirror the requirements in section 523(a)(2)(A).

To succeed in proving a false representation under section 523(a)(2)(A), a creditor must prove: (1) the debtor made a false representation with the intention of deceiving the creditor; (2) the creditor relied on the false representation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the false representation. Presley v. Presley (In re Presley), 490 B.R. 633 (Bankr. N.D. Ga. 2013). "As distinguished from false representation, which is an express misrepresentation, false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression[.]" Minority Equity Capital Corp. v. Weinstein (In re Weinstein), 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983). To establish a claim under false pretenses,

the creditor must prove: "(1) the [defendant] made an omission or implied misrepresentation; (2) promoted knowingly and willingly by the defendant; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; (4) which wrongfully induced the plaintiff to advance money, property, or credit to the defendant." Cawthon v. Cawthon (In re Cawthon), 594 B.R. 913, 920 (Bankr. N.D. Ga. 2018). Fraud is a generic term which includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." Burke v. Burke (In re Burke), 405 B.R. 626, 646 (Bankr. N.D. Ill. 2009). In all instances, the creditor must also show justifiable reliance on the debtor's false pretenses, false representation, or actual fraud. Field v. Mans, 516 U.S. 59, 74 (1995); see also Bankers Healthcare Grp., LLC v. Moss (In re Moss), 598 B.R. 508, 514 (Bankr. N.D. Ga. 2019).

A breach of contract is not a misrepresentation, false pretense, or fraud unless the debtor never intended to comply with the contract. Res-Ga Diamond Meadows, LLC v. Robertson (In re Robertson), 576 B.R. 684, 716 (Bankr. N.D. Ga. 2017) (citations omitted). To raise a section 523(a)(2)(A) claim based on a debtor's failure to perform a promise, a creditor must show that the debtor lacked the subjective intent to perform the promise when the promise was made. In re Cole, 2021 WL 784886, at *5 (Bankr. M.D. Fla. Mar. 1, 2021), aff'd, 2022 WL 1096091 (M.D. Fla. Mar. 31, 2022). "It is a matter of well-entrenched jurisprudence that a contractor's failure to perform as promised, standing alone, gives rise to a case for breach of contract, not actionable fraud, misrepresentation or false pretenses under § 523(a)(2)(A). . . . Otherwise, almost any debt arising out of a failure to complete a contract would be nondischargeable and that is not the way the statute is written." Strominger v. Giquinto (In re Giquinto), 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008); In re Layne, 517 B.R. 778, 783 (Bankr. E.D. Ky. 2014) ("A failed promise to repay is the basis for every loan default."). Instead, the plaintiff must establish that the debtor entered into

16

the contract, never intending to adhere to its terms. In re Maurer, 112 B.R. 710, 713 (Bankr. E.D. Pa. 1990); c.f. In re Moore, 620 B.R. 617, 630 (Bankr. N.D. Ill. 2020) (representations to do future acts do not constitute false representations for purpose of section 523(a)(2)(A) unless the debtors never intended to perform).

Plaintiff has alleged he was fraudulently induced to enter into the contract because Defendant never intended to comply with it, but the undisputed evidence shows Defendant and RRJ made many efforts to comply. They made payments on the Note and Guaranty for three years, paying over $46,000. They complied with the new amortization schedule set by Plaintiff in September 2018 for over a year. The payments continued even during the COVID-19 pandemic. Plaintiff did not declare a default until August 13, 2021, more than three years after entering into the agreement. Plaintiff has pointed to no evidence in the record supporting an allegation that Defendant never intended to comply with the guaranty. The facts alleged relate to Defendant and RRJ's post-closing activities and, while the Complaint alleges false representations were made, it fails to identify any specific statements that were made prior to entering into the transaction. The facts here are similar to those in In re Cole, 2021 WL 784886, where the court noted that while the defendant ultimately breached the agreement, the defendant "demonstrated he wanted to, and substantially did, perform his duties" for two and a half years. Id. at *6; see also In re Viciedo, 612 B.R. 233, 240 (Bankr. M.D. Fla. 2020) (finding plaintiff failed to meet its burden of proving a fraudulent inducement and finding, instead, the arrangement was simply an ill-conceived business relationship). Accordingly, there is no basis for finding Plaintiff's claim relating to Defendant's breach of the contract nondischargeable, and summary judgment is appropriate for Defendant.

### B.  Disposition of collateral

Next, Plaintiff complains Defendant improperly disposed of business collateral and vehicles and failed to pay him the sales proceeds.[2]

#### 1.  Disposition of property other than cars

Construing Plaintiff's allegations, it seems Plaintiff contends he held a security interest in all property of RRJ, RRJ disposed of the business collateral and failed to remit the proceeds to Plaintiff, and Defendant is personally liable since she directed and participated in the disposition of collateral.

The Security Agreement granted Wild Rose a security interest (which was assigned to Plaintiff) in a number of listed property categories and "all other assets of [RRJ] now owned or becoming property of [RRJ] while amounts are due and owing . . . together with all proceeds from the foregoing." Defendant admits that RRJ ceased business and that she disposed of business property in various ways: some was stored; some was used up in the business; some was donated to Goodwill; and some was sold. The question is whether RRJ improperly made these dispositions, creating a claim for Plaintiff against Defendant which is nondischargeable.

As a general matter, "a security agreement is effective according to its terms between the parties." O.C.G.A. § 11-9-201(a). "A security interest attaches to collateral when it becomes enforceable against the debtor[.]" O.C.G.A. § 11-9-203(a). A security interest becomes enforceable if value has been given, the debtor has rights in the collateral, and in this case, "[t]he debtor has authenticated a security agreement that provides a description of the collateral."

---

[2] In his response, Plaintiff contends Defendant was liable because she transferred secured assets within 90 days of the petition. This allegation sounds like a preference claim under 11 U.S.C. § 547, but Plaintiff does not have standing to assert that claim. Cambridge Tempositions, Inc. v. Cassis (In re Cassis), 220 B.R. 979, 983 (Bankr. N.D. Iowa 1998) (trustee, not creditor, is appropriate party to weigh merits of preference action against costs and benefits to estate). So the Court has not addressed it.

O.C.G.A. § 11-9-203(b). Finally, the attachment of the security interest in collateral also gives the secured party the right to proceeds. O.C.G.A. §§ 11-9-203(f); 11-9-315(a)(2). For a secured party to take priority in collateral over other creditors, the security interest must be perfected, O.C.G.A. § 11-9-308, and perfection generally occurs upon filing a UCC financing statement. O.C.G.A. § 11-9-310(a). But a security agreement remains effective between the parties in the absence of perfection. See Cont'l Am. Life Ins. Co. v. Griffin, 251 Ga. 412, 414 (1983) ("security agreement is effective according to its terms between the parties").

In Georgia, conversion is defined as "an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation[.]" Levenson v. Word, 294 Ga. App. 104, 106 (2008), aff'd, 286 Ga. 114 (2009) (citation omitted). A secured creditor has a right of action for conversion if property subject to its security interest is disposed of without the creditor's authorization. William Goldberg & Co., Inc. v. Cohen, 219 Ga. App. 628, 640 (1995); see also O.C.G.A. § 51-10-1 ("The owner of personalty is entitled to its possession. Any deprivation of such possession is a tort for which an action lies."). The elements of such a claim are the existence of a valid security interest in the debtor's property, disposition of that property, absence of the creditor's authorization for the disposition, and resulting damage to the creditor. Id.; see also Alexander Law Firm, P.C. v. Richburg, 361 Ga. App. 376 (2021). A claim for conversion only entitles the Plaintiff to recover the value of the property converted, not to exceed the total debt. In re Ricci, 2003 WL 25932297, at *8 (Bankr. S.D. Iowa Aug. 27, 2003) ("recovery cannot exceed the value of the security interest in the collateral or the value of the collateral at the time of the conversion").

There is no claim for conversion where the sale is not prohibited, either in the loan documents or through course of conduct. In In re Wright, 282 B.R. 510 (Bankr. M.D. Ga. 2002), for example, the debtor sold property that was collateral for a debt owed by the creditor to a third party. The court found the contract did not require "that the *proceeds* of the sale be submitted to either the creditor or the government. Nor was there any requirement that the proceeds be held in a separate account." Id. at 518; see also In re Lovvorn, 430 B.R. 318, 328 (Bankr. M.D. Ga. 2010) (looking to the terms of the agreement); In re Wright, 299 B.R. 648, 662 (Bankr. M.D. Ga. 2003). Similarly, in Rentrak Corp. v. Cady (In re Cady), 195 B.R. 960 (Bankr. S.D. Ga. 1996), the debtor sold video tapes and used the proceeds to operate his business. The court found the debtor had authority under the applicable agreement to sell the tapes without prior approval of the lender. The bankruptcy court noted that where a debtor is not required to isolate funds in a separate account and has unrestricted use of the funds, the debtor was authorized to use the proceeds in the everyday operation of the store. See also In re O'Steen, 581 B.R. 668 (Bankr. M.D. Fla. 2017) (sale of cattle subject to a security interest was not prohibited where debtors used money from their cull account for operating expenditures other than the purchase of replacement cows).

Acquiescence to the sale may also be provided by course of conduct or the nature of the collateral. "Inventory," for example, anticipates goods being sold in the ordinary course of business and also goods are that are consumed in a business. U.C.C. § 9-102 cmt. 4(a). In In re Rezykowski, 493 B.R. 713, 723–24 (Bankr. E.D. Pa. 2013), the debtor operated a business for approximately two years and sold inventory in the ordinary course of business. The debtor arguably violated the security agreement each time she sold inventory without the prior written consent of the plaintiff. However, the court found the plaintiff acquiesced to the practice where there was no evidence the plaintiff notified the debtor that she was in violation of the security

20

agreement for selling inventory. The court found the debtor's use of the inventory in the ordinary course of business was consistent with case law that a secured party with a security interest in the inventory of a retail seller is presumed to have authorized the sale of the inventory to purchasers. See also In re Darling's Homes, Inc., 46 B.R. 370 (Bankr. D. Del. 1985); Restatement (Second) of Torts § 228 cmt. c ("The limits of the permitted use ordinarily are determined by the terms, express or reasonably to be implied, of the contract or other agreement between the parties . . . The character of the chattel, its adaptability to the use made of it, and the purposes for which it is customarily used" are also factors in determining if the lender has consented to a sale).

It is well established that officers and directors of a corporation will be held liable for debts of the corporation where their participation in the commission of tortious act, such as conversion, results in some harm to a third party and causes them to be liable to that party. In re Penton, 299 B.R. 701, 705 (Bankr. S.D. Ga. 2003) (citing Ford Motor Credit Co. v. Owens, 807 F.2d 1556, 1559 (11th Cir. 1987)). The officer or director of the corporation will be held liable as actor and not corporate officer. Id. Courts have held that an individual debtor who, as an officer of a corporation, actively participates in the conversion of property which is subject to the security interest of a third party, is personally liable to the injured party. Owens, 807 F.2d at 1559; see also In re Richardson, 2007 WL 2381990, at *6 (Bankr. N.D. Ala. Aug. 17, 2007). In Owens, for example, the debtor was an officer, director, and majority shareholder of the corporation and had personally guaranteed the underlying debt (the car dealership's floor plan agreement). Although the corporation was required to hold the proceeds from the sales of the vehicles for the creditor, the defendant sold vehicles without remitting the proceeds to the lender and transferred funds to another dealership which he owned. The court found the debtor had actively participated in conversion because he made the decision to dispose of automobiles without turning over the

proceeds to the creditor and, thus, he was personally liable to the lender. Id.; see also Mercantile Bank of Arkansas, N.A. v. Speers (In re Speers), 244 B.R. 142 (Bankr. E.D. Ark. 2000) (debtor was the sole shareholder of a RV dealership, debtor sold an RV without paying off the secured lender, and used proceeds for personal use). An individual officer will not be personally liable where he did not actively participate in the conversion. See e.g., In re Staggs, 573 B.R. 898, 912 (Bankr. N.D. Ala. 2017).

Here, it is undisputed Defendant was the president of RRJ. She executed a guaranty of RRJ's note. There is no question that she actively participated in the act of which Plaintiff complains. But it is also undisputed that nothing in the Security Agreement requires Plaintiff's consent to dispose of collateral or proceeds thereof. Paragraph 6 says RRJ cannot change the location of personal property of the business without 30 days' notice, but there is nothing that specifically requires Plaintiff's consent to dispose of collateral, or a requirement that proceeds be segregated and not used in the business.

Defendant admits RRJ disposed of many assets in which Plaintiff held a security interest. The disposition falls into four categories: 1) placed in storage, 2) used in business, 3) donated to Goodwill, and 4) sold. Plaintiff does not identify any specific items disposed of other than what Defendant has identified.

In the first category, the undisputed facts are that the following items are in storage:

- Wooden and plastic bookshelves;

- Three metal storage cabinets;

- A new cleaning fluid station that replaced the one purchased;

- Two vacuum cleaners;

- Various structural office storage devices;

- One portable steam cleaner;

22

- A ScanSnap document scanner; and

- Four Samsung tablets and five phones.

No claim for conversion exists as to these items since no disposition occurred.

In the second category are supplies, inventory, and items used in the business, specifically office supplies, cleaning supplies, and aprons and shirts provided to employees. Given the nature of this property, it was meant to be used in the ordinary course of business. Inventory means goods consisting of materials used or consumed in a business. UCC § 9-102. This includes goods that are used in providing a service. UCC § 9-102 cmt. 4(a). Examples of materials used or consumed in a business are "fuel to be used in operations, scrap metal produced in the course of manufacture, and containers to be used to package the goods." In re Aluminum Extrusions, Inc., 2019 WL 5677572, at *2 (Bankr. N.D. Miss. Oct. 31, 2019). The Court finds Plaintiff authorized RRJ to use these items in its business and such use is not conversion. See Wright, 299 B.R. at 662; In re Neal, 300 B.R. 86, 91 (Bankr. M.D. Ga. 2003); In re Rezykowski, 493 B.R. at 723–24.

In the third category are the following items identified by Defendant:

- An old wooden office desk that was donated to Goodwill;

- An old couch that was disposed of due to bed bugs;

- Miscellaneous office chairs that were either disposed of or donated to Goodwill; and

- Two washers and two dryers donated to Goodwill.

There is no dispute all of these items were used in the business and donated after the expiration of their useful life. Given the undisputed fact of the condition of the items at issue, their disposal was in the ordinary course of business. Moreover, their condition establishes Plaintiff was not harmed by the disposition. Without an allegation of wrongful conduct or damage, there can be no claim for conversion. Va. Vermiculite, Ltd. v. W.R. Grace & Co.- Conn., 965 F. Supp. 802, 832 (W.D.

Va. 1997), rev'd sub nom. Va. Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535 (4th Cir. 1998).

Finally, the fourth category includes items sold as Defendant wound down the business:

- Four washer/dryer units sold for $1,000; and

- One vacuum sold to Sally Pearson for $175, and one sold to Gloria Laplante for $275.[3]

These items, in which Plaintiff held a security interest, were not sold in the ordinary course of business. But the sale of the collateral was not expressly prohibited and RRJ had no obligation to segregate the proceeds. Wright, 282 B.R. at 518 (no conversion where no contractual requirement that the proceeds be held in a separate account); Neal, 300 B.R. at 91 (no requirement to deposit sales proceeds into a separate account); Cady, 195 B.R. 960.

Further, even if the sale of the vacuums and washers and dryers was conversion, not every conversion under state law creates a nondischargeable claim. Conversion can be a form of "actual fraud" under section 523(a)(2)(A). In re Moschell, 607 B.R. 487, 495–96 (Bankr. W.D. Pa. 2019); see also Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581, 1586 (2016); Burke, 405 B.R. at 646. "Actual" fraud, though, stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." Husky Int'l Elecs., Inc., 136 S. Ct. at 1586. Thus, if the conversion involves deception or trickery, and is done with wrongful intent or moral turpitude, the claim falls within the coverage of "actual fraud" for purposes of section 523(a)(2)(A). Id.; see also In re Moschell, 2020 WL 5998166, at *7 (Bankr. W.D. Pa. Oct. 9, 2020). Where there is no such intent, the claim is dischargeable. In re Tinkler, 311 B.R. 869, 882 (Bankr. D. Colo. 2004), for example, the court found the case presented an "innocent or technical" conversion and that the claim was therefore dischargeable.

---

[3] The disposition of cars is discussed below.

Plaintiff has pointed to no facts showing the sale of the two vacuums and washers and dryers for a total of $1,450 involved deception or trickery. The Complaint contends in conclusory fashion that Defendant used assets and proceeds to pay business and personal liabilities.[4] Defendant denied the allegations. The allegations are unsupported by facts in the record and, in any event, use of the proceeds of business assets to pay business liabilities is not prohibited by the Security Agreement. Plaintiff's response to the Motion focuses on the cars, discussed below, and does not mention the vacuum cleaners or old washers and dryers. As the party with the burden of proof, the burden was on Plaintiff to point to specific facts showing deception or fraud, and he did not do so.

Plaintiff also contends his claim arising from the disposition of non-car collateral should be deemed nondischargeable pursuant to section 523(a)(4) of the Bankruptcy Code, which provides a discharge exception for debts obtained, "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." For a debt to be nondischargeable pursuant to section 523(a)(4) based on fraud or defalcation, the debtor must have been acting as a fiduciary in accordance with an express or technical trust that existed prior to the wrongful act. Newton v. Lemmons (In re Lemmons), 2005 WL 6487216, *4 (Bankr. N.D. Ga. Dec. 20, 2005) (citation omitted). A technical trust has been defined by the Eleventh Circuit as "an express trust created by statute or contract that imposes trust-like duties on the defendant and that pre-exists the alleged defalcation," as opposed to constructive or resulting trusts. Parker v. Ferland (In re Ferland), 2010 WL 2600588, at *3 (Bankr. M.D. Ga. June 21, 2010) (citation omitted); see also Guerra v. Fernandez-Rocha (In re Fernandez-Rocha), 451 F.3d 813, 816 (11th Cir. 2006). The Eleventh

---

[4] The Complaint references the meeting of creditors, but Plaintiff did not include the section 341 transcript, so the allegation is also hearsay. See In re Watkins, 474 B.R. 625, 651 n.8 (Bankr. N.D. Ind. 2012), aff'd sub nom. Manning v. Watkins, 2013 WL 3989412 (N.D. Ind. July 31, 2013).

Circuit recently specified that "fiduciary capacity" within the meaning of section 523(a)(4) requires "(1) a trustee, who holds (2) an identifiable trust res, for the benefit of (3) an identifiable beneficiary or beneficiaries." In re Forrest, 47 F.4th 1229, 1241 (11th Cir. 2022), cert. denied sub nom. Spring Valley Produce, Inc. v. Forrest, 143 S. Ct. 2579 (2023). Moreover, "the fiduciary relationship must define sufficient trust-like duties imposed on the trustee with respect to the trust res and beneficiaries to create a technical trust." Id. Finally, "the debtor must be acting in a fiduciary capacity before the act of fraud or defalcation creating the debt." Id.

"Mere friendship does not meet this standard, nor does an ordinary business relationship." In re Ferland, 2010 WL 2600588, at *3 (citation omitted). Further, a debtor's status as an officer or director of a Georgia corporation does not, by itself, create a fiduciary relationship between the officer or director and the corporation within the meaning of 11 U.S.C. § 523(a)(4). In re Bayer, 521 B.R. 491, 509 (Bankr. E.D. Pa. 2014) (citing In re Pervis, 497 B.R. 612, 639–40 (Bankr. N.D. Ga. 2013); In re Barbee, 479 B.R. 193, 207 (Bankr. S.D. Ga. 2012); Burke v. Riddle (In re Riddle), 2011 WL 2461896, at *3–4 (Bankr. N.D. Ga. Apr. 6, 2011); In re Miles, 2011 WL 1124183, at *4 (Bankr. N.D. Ga. Mar. 14, 2011)). As one court explained, a general duty of good faith imposed under Georgia law "does not rise to the level of an express or technical trust of the kind required for nondischargeability." In re Sutton, 2008 WL 4527761, at *3 (Bankr. M.D. Ga. Oct. 2, 2008). Further, Georgia laws do "not impose a heightened duty on the officer or director and do not use the term 'fiduciary' to describe the duties or in any way speak in terms of a trust." Pervis, 497 B.R. at 640.

Plaintiff has pointed to no facts to support an allegation that Defendant held a fiduciary position vis-à-vis Plaintiff. She entered into an ordinary business transaction with Plaintiff. She was not a fiduciary vis-à-vis Plaintiff or RRJ. She did not even have an obligation to segregate

26

sales proceeds under the Security Agreement. Section 523(a)(4)'s provisions regarding fraud and defalcation as a fiduciary are not applicable.

Section 523(a)(4) also excepts from discharge debts obtained by larceny and embezzlement. Larceny and embezzlement need not be in a fiduciary capacity to be nondischargeable. See Transam. Com. Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991). Larceny is "a felonious taking of property with the intent to convert it or to permanently deprive the owner of it." Riddle, 2011 WL 2461896 at *4 (citation omitted). "Embezzlement is the 'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" Ga. Dep't Human Servs. v. Ngwangu (In re Ngwangu), 529 B.R. 358, 365 (Bankr. N.D. Ga. 2015) (quoting Fernandez v. Havana Gardens, LLC, 562 F. App'x. 854, 856 (11th Cir. 2014)). The primary difference between larceny and embezzlement is that with larceny, the debtor wrongfully takes the property from someone else, while with embezzlement, the debtor has rightfully come into possession of the property but wrongfully appropriates it for his own use. See Cook v. Knight (In re Knight), 621 B.R. 529, 537 (Bankr. N.D. Ga. 2020).

Embezzlement requires a showing that: "(i) property owned by another is rightfully in the possession of the debtor; (ii) the debtor appropriates the property for personal use, and (iii) the appropriation occurred with fraudulent intent or by deceit." Hot Shot Kids Inc. v. Pervis (In re Pervis), 512 B.R. 348, 382–83 (Bankr. N.D. Ga. 2014). "It is knowledge that the use is devoid of authorization, scienter for short . . . that makes the conversion fraudulent and thus embezzlement." Lenox Pines, LLC v. Smith (In re Smith), 2021 WL 1234245, *10 (Bankr. N.D. Ga. Mar. 31, 2021). Fraudulent intent may be shown by circumstantial evidence. Knight, 621 B.R. at 537 (citation omitted). The Court is to take into consideration all the circumstances in order to make a

determination of intent to defraud. Id. Courts consistently find that concealment on the part of a debtor is evidence of fraudulent intent. Id.

It is undisputed Defendant disposed of RRJ's non-car business collateral without delivering proceeds from the disposition to Plaintiff. The question is whether Defendant appropriated the proceeds from the sale of RRJ's collateral with fraudulent intent or deceit. Plaintiff has pointed to no facts showing Defendant kept the $1,450 received from the sale of the collateral. As discussed above, the Security Agreement did not require segregation of proceeds, and the conclusory allegations that Defendant paid business and personal liabilities is insufficient to defeat the motion for summary judgment.

Plaintiff also cites to section 523(a)(7) as a basis for making his claim nondischargeable. But section 523(a)(7) excepts from discharge certain fines, penalties, and forfeitures. The section provides:

> (7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty--
> > (A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or
> > (B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition

11 U.S.C. § 523(a)(7). The "fine, penalty or forfeiture" may be either criminal or civil in nature and may include restitution in certain circumstances. U.S. v. WRW Corp., 986 F.2d 138, 145 (6th Cir. 1993); Kelly v. Robinson, 479 U.S. 36, 53 (1986). This section is not applicable.

### 2.  Disposition of Cars

Plaintiff complains Defendant disposed of four vehicles in which it held a security interest without Plaintiff's consent and used the proceeds from the sale to satisfy her personal debts.

The first issue is whether Plaintiff sold the vehicles to Defendant or RRJ. The Court concludes the cars were sold to RRJ. When Plaintiff sold the business, Wild Rose transferred ownership of four vehicles. The closing documents included four certificates of title dated December 31, 2017, all of which list Wild Rose Management Inc as a transferor; no transferee is listed. The APA between Wild Rose and RRJ assigned a value of $24,000 to the vehicles. The Note signed by RRJ included this value. Further, Defendant's affidavit and statement of material facts submitted in connection with the Motion refer to the four automobiles "included in the transfer of the business." Although Defendant's name—not RRJ's—was later listed on the sale agreements with CarMax on three of the vehicles, that does not negate the evidence that Wild Rose transferred the cars to RRJ. A transfer of ownership from the seller to the buyer of a motor vehicle is thus effective even if the certificate of title registration requirements are not followed. State v. Banks, 215 Ga. App. 828 (1994); O.C.G.A. § 40-3-32(d). A certificate of title creates a presumption as to the owner, which may be overcome by evidence to the contrary. In re Sw. Bus. Design, Inc., 1997 WL 33421086, at *5 (Bankr. D.N.D. July 17, 1997) ("Another indicium of ownership can be in whose name the vehicle is titled."); O'Donnell v. Chertok (In re Cork & Bagel Trading Co.), 192 B.R. 789 (Bankr. E.D. Me. 1995) (stating that the defendant overcame the presumption that the debtor was the owner of the vehicle based upon the certificate of title). At most, the CarMax contracts raise the question of whether the cars were subsequently sold to Defendant.

Next, Defendant argues in the Motion that Wild Rose and Plaintiff do not hold a security interest in the cars because no lien was on the titles. In Georgia, the Motor Vehicles Certificate of Title Act dictates the exclusive procedure for a creditor to perfect a consensual security interest in a motor vehicle. O.C.G.A. § 40-3-1, et. seq. (the "MV Title Act"); see also Staley v. Phelan Finance

Corp., 116 Ga. App. 1, 1–2 (1967). The MV Title Act provides that this procedure "shall be the exclusive method for perfection of liens on vehicles, and no lien shall be effective as to a vehicle unless so perfected." O.C.G.A. § 40-3-53(d); Maley v. Nat'l Acceptance Co., 50 F. Supp. 841 (N.D. Ga. 1966); Tidwell v. First Cmty. Bank of Ga. (In re Charley's Auto.), 2003 WL 21058331, at *2 (Bankr. M.D. Ga. May 8, 2003). But "[a] failure to perfect a security interest in a motor vehicle pursuant to the certificate of title act, does not nullify the security interest, although the unsecured party may lose priority where the rights of third parties are concerned." Charley's Auto., 2003 WL 21058331, at *2 (citing Freeman v. Bentley, 205 Ga. App. 409 (1992); Sun Trust Bank of Atlanta v. Atlanta Classic Cars, Inc., 249 Ga. App. 726 (2001)). In SunTrust Bank, Atlanta v. Atlanta Classic Cars, Inc., the court explained that the failure to perfect a security interest "does not affect the *creation* of the security interest, which remains a matter of contract between the parties. It follows that a failure to comply with the [MV Title] Act does not nullify the contract but merely has the effect of loss of priority where the rights of third parties who complied with the Act have intervened." Id. at 728.

It is undisputed that Plaintiff did not perfect his security interest in the vehicles as required by the MV Title Act. Plaintiff contends, though, that he nevertheless retained a security interest in the vehicles by virtue of the Security Agreement and UCC filing. As explained above, a security interest is enforceable between the parties if the debtor has signed a security agreement that provides a description of the collateral. O.C.G.A. § 11-9-203(b). If the collateral is not described in the security agreement, no lien is created. ITT Fin. Servs. v. Gibson, 188 Ga. App. 188, 189 (1988) (agreement referred to exhibit which was not part of the record). The Security Agreement at issue here does not specifically identify the vehicles.

Plaintiff argues vehicles were covered by the Security Agreement and UCC filing as "equipment."[5] If "equipment" includes the vehicles, then the grant of a security interest in them is sufficient as between the parties. Georgia's Uniform Commercial Code defines "equipment" as "[g]oods other than inventory, farm products, or consumer goods." O.C.G.A. § 11-9-102(34). "Goods" are defined as "[a]ll things that are movable when a security interest attaches." O.C.G.A. § 11-9-102(45). Black's Law Dictionary defines "equipment" as:

> The articles or implements used for a specific purpose or activity (esp. a business operation). Under the UCC, equipment includes goods if (1) the goods are used in or bought for a business enterprise (including farming or a profession) or by a debtor that is a nonprofit organization or a governmental subdivision or agency, and (2) the goods are not inventory, farm products, or consumer goods. UCC § 9–102(a)(33).

Equipment Definition, Black's Law Dictionary (10th ed. 2014); see also In re Sci. Fitness, LLC, 2017 WL 4339629, at *4 (Bankr. S.D. Ga. Sept. 28, 2017). The definition of "equipment" is broad. U.C.C. § 9-102:10 Goods; inventory, equipment, farm products, consumer goods; fixtures, 8 Hawkland U.C.C. Series § 9-102:10. "A particular item, for example a physician's car or a farmer's truck, might be considered inventory, equipment, or a consumer good depending on its use." U.C.C. § 9-102 cmt. 4(a). "Machinery used in manufacturing is equipment, not inventory, even though the debtor may sell the good when it becomes obsolete or worn." Aluminum Extrusions, Inc., 2019 WL 5677572, at *2 (citing U.C.C. § 9-102 [Rev.] cmt. 4(a)). In borderline cases "the principal use of the property is determinative." Id. "The factors to be considered in determining principal use include whether the goods are for immediate or ultimate sale and whether they have a relatively long or short period of use in the business." Id. In general, "goods used in business are equipment if they are fixed assets or have, as identifiable units, a relatively long period of use, but

---

[5] Plaintiff may also argue that the vehicles are covered by the description "all other assets of [RRJ]." But the UCC makes clear this description is insufficient. O.C.G.A. § 11-9-108; see also In re Southeastern Emerg. Healthcare, P.C., 85 B.R. 170, 172 (Bankr. N.D. Ga. 1988).

are inventory, even though not held for sale or lease, if they are used up or consumed in a short period of time in producing a product or providing a service." Id. The characterization of a particular good is a question of fact. Id. at *3; see also In re Buffalo Molded Plastics, Inc., 354 B.R. 731, 746 (Bankr. W.D. Pa. 2006).

Here, the undisputed facts do not allow the Court to determine if the vehicles are included in the definition of equipment as it turns on the facts of the case, including the intent of the parties, and the use of the vehicles. The closing documents did not list a purported lien on the cars. The parties contemplated an Exhibit A with specific lists, but the exhibit, if there is one, is not attached to the Complaint. Section 2.02 of the APA allocates $24,000 of the purchase price to cars and a separate $20,00 to furniture, fixtures, and equipment, suggesting the cars may not be "equipment." The Bill of Sale does not mention the cars, but it mentions other assets owned by Plaintiff and used in the business and references Exhibit A to the APA. The Security Agreement and UCC statement cover all assets of RRJ; they do not mention any vehicles. In sum, the APA assigns value to the cars in the purchase price but does not identify the vehicles; the Bill of Sale does not mention the cars; and the Security Agreement and UCC statement do not mention any vehicles specifically. The Court cannot determine on this record if the cars are "equipment" in which Plaintiff held a security interest.

If at trial the Court finds the vehicles are not equipment, then Plaintiff did not retain a security interest in the vehicles. Because there is a right of action for conversion only when property subject to a security interest is disposed of without authorization, if Plaintiff did not retain a security interest in the four Kia Souls, Plaintiff's claim for conversion fails.

On the other hand, if the Court determines the vehicles are included in the phrase "equipment," then sale of the vehicles or other disposition of them or their proceeds could give

rise to a claim for conversion. As discussed above, the Security Agreement does not require segregation of proceeds or prohibit outright sale. But Plaintiff has pointed to the fact the three cars were sold listing Defendant as the owner, suggesting she inappropriately obtained title to RRJ's property and used the vehicles and their proceeds for her personal benefit. Moreover, the vehicles appear to have been sold very shortly before the bankruptcy filing and, thus, not in the ordinary course of RRJ's business. Finally, neither party informed the Court as to the details of the "totaled" car. Depending on the development of these facts, it is possible a claim could be stated for the value of the car proceeds and such claim could be nondischargeable depending on the use of the proceeds and other facts. Defendant's Motion for Summary Judgment is denied as to Plaintiff's claim for damages arising from the disposition of the four cars and the dischargeability of such claim.

Finally, Plaintiff contends in the Complaint that Defendant is the recipient of a fraudulent conveyance under O.C.G.A. § 18-2-70 et seq. Georgia law provides in pertinent part:

> [a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> > (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> > (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> > > (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > > (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

O.C.G.A. § 18-2-74.

If RRJ fraudulently conveyed assets to Defendant, then Plaintiff could have a claim for the value of the property conveyed against Defendant as the transferee. O.C.G.A. § 18-2-77. This claim does not rely on Plaintiff holding a security interest in the vehicles because Plaintiff is a creditor, even if unsecured. An unsecured creditor can sue for a fraudulent conveyance of its obligor and recover against the transferee. O.C.G.A. § 18-2-74. Plaintiff alleges the three vehicles sold to CarMax were fraudulently conveyed to Defendant because they were sold to RRJ, yet the Defendant individually is listed as the owner of them in the Car Max contracts. The record leaves open the question of how Defendant came to be the owner of the cars, what consideration was paid for them, when the transfer occurred and the circumstances surrounding the transfer, in addition to the questions highlighted above regarding the use of the funds. A claim against a transferee who receives a fraudulent transfer can be held nondischargeable under section 523(a)(2) of the Bankruptcy Code, as held by the Supreme Court in Husky Int'l Elecs., Inc., 136 S. Ct. at 1586. As the Supreme Court explained, fraudulent conveyances do not require a misrepresentation from a debtor to a creditor. The fraudulent conduct is not in dishonestly inducing a creditor to extend a debt; rather, it is in the acts of concealment and hindrance. Id. at 1587. Conveyances that hinder, delay, or defraud creditors are void as against the recipient unless that party received it in good faith and for consideration. Id. at 1588. Given the disputed facts, Defendant is not entitled to summary judgment on Plaintiff's claim for fraudulent conveyance as to the three cars sold by Defendant to CarMax.

## IV.   **Denial of Discharge**

Plaintiff also seeks to deny Defendant a discharge. One of the fundamental goals of the Bankruptcy Code is to relieve the "honest but unfortunate debtor" of his indebtedness, allowing him to make a financial "fresh start." Grogan, 498 U.S. 279; Miller, 39 F.3d at 304. This fresh start

34

is primarily accomplished through the discharge of debt. <u>See</u> S. Rep. No. 95-989, at 7 (1978),

reprinted in 1978 U.S.C.C.A.N. 5787, 5793 (section 727 is central to the fresh start policy).

Generally, a Chapter 7 debtor receives a complete discharge from most prepetition debts pursuant

to section 727(b) of the Bankruptcy Code.

Nonetheless, "[t]here is no constitutional right to obtain a discharge in bankruptcy, . . . [It]

is a legislatively created benefit . . . ." <u>U.S. v. Kras</u>, 409 U.S. 434 , 446–47 (1973); <u>Siegel v. Weldon</u>

<u>(In re Weldon)</u>, 184 B.R. 710, 712 (Bankr. D.S.C. 1995) (discharge is not a matter of right, but

rather a statutory privilege for honest debtors). The Bankruptcy Code limits the opportunity for a

completely unencumbered new beginning to the "honest but unfortunate debtor," <u>Grogan</u>, 498 U.S.

at 287, and section 727(a) of the Bankruptcy Code may be utilized to deny a discharge to dishonest

debtors, however unfortunate. S. Rep. No. 95-989, at 7 (1978).

Because "the basic objectives underlying the hope of bankruptcy [is to] afford a bankrupt

a new chance," <u>Hughes v. Lieberman (In re Hughes)</u>, 873 F.2d 262, 263 (11th Cir. 1989), discharge

provisions are construed liberally in favor of the debtor and strictly against the objecting party.

<u>Hunerwadel v. Dulock (In re Dulock)</u>, 250 B.R. 147, 153 (Bankr. N.D. Ga. 2000). The party

objecting to discharge bears the burden of proving, by a preponderance of the evidence, the

debtor's discharge should be denied. Fed. R. Bankr. P. 4005; <u>In re Matus</u>, 303 B.R. 660, 671

(Bankr. N.D. Ga. 2004). Moreover, "[t]he grounds for denial of discharge must be proven

specifically, and the proof must be directed at the transfer or concealment alleged. A debtor should

not be denied a discharge on 'general equitable considerations.'" <u>Dulock</u>, 250 B.R. at 153 (citing

<u>Rice v. Matthews</u>, 342 F.2d 301, 304 (5th Cir. 1965)). To deny a debtor a discharge requires

culpable intent. As the court in <u>In re Watkins</u> stated,

> Denial of discharge is in particular meant to be an extreme imposition of a sanction,
> to be imposed upon relatively bad people who have consistently done bad things;

not so bad people who have done fairly seriously bad things in certain circumstances; or anyone who has done one really bad thing which permeates and precludes the effective administration of a bankruptcy case. It is not meant to be imposed upon an individual who was lax or careless in the conducting of financial affairs or the keeping of records in relation to them—in other words, people whose conduct may fall short of strict technical legal requirements but do not evidence the intent of figuratively thumbing their noses at their creditors, bankruptcy trustees and/or the court.

474 B.R. at 642.

Plaintiff alleged in the Complaint that Defendant's discharge should be denied under section 727(a) generally and sections 727(a)(3) and (a)(4) specifically. Since the Court must review all the evidence in the light beneficial to the Plaintiff as the non-moving party, it will examine all sections of section 727 that seem relevant to Plaintiff's allegations.

### A. 727(a)(2)

Section 727(a)(2) is designed to preclude the discharge of a debtor who attempted to avoid paying creditors by concealing or disposing of assets. Under section 727(a)(2), a plaintiff must prove the following by a preponderance of the evidence to support a denial of discharge: "(1) that the act complained of was done within one year prior to the date the petition was filed, (2) with actual intent to hinder, delay, or defraud a creditor, (3) that the act was that of the debtor, and (4) that the act consisted of transferring, removing, destroying, or concealing any of the debtor's property." Jennings v. Maxfield, 533 F.3d 1333, 1339 (11th Cir. 2008).

First, the plaintiff must establish the transfer at issue was made within the prescribed time period—within the year prior to the petition date. In re Geer, 522 B.R. 365, 394 (Bankr. N.D. Ga. 2014) (citing 11 U.S.C. § 727(a)(2)).

Second, the plaintiff must prove that the debtor possessed an actual intent to defraud creditors when he concealed or transferred the property. In re White, 568 B.R. 894, 910 (Bankr. N.D. Ga. 2017). In other words, the debtor must have had actual fraudulent intent at the time of

the transfer or concealment, such that the conduct was "blameworthy in an equitable sense." In re Robertson, 576 B.R. 684, 700 (Bankr. N.D. Ga. 2017). Since a debtor is not likely to "admit that he intended to hinder, delay, or defraud his creditors, the debtor's intent may be established by circumstantial evidence or inferred from the debtor's course of conduct," based on certain badges of fraud. Id.; see also In re McKeever, 550 B.R. 623, 636 (Bankr. N.D. Ga. 2016).

Further, the act must be that of the debtor and the transfers at issue must involve property of the debtor (pre-petition) or property of the estate (post-petition). Geer, 522 B.R. at 391–92. A prohibited transfer under section 727 must be a transfer of property of the debtor that otherwise would have been property of the estate under section 541. Id. at 393. The debtor "must have more than a mere *derivative interest* in the property in question because the term 'property of the debtor' as expressed in 11 U.S.C. § 727(a)(2)(A) has reference to property in which the debtor has a *direct* proprietary interest." See Wachovia Bank, N.A. v. Spitko (In re Spitko), 357 B.R. 272 (Bankr. E.D. Pa. 2006); Northeastern Neb. Econ. Dev. Dist. v. Wagner (In re Wagner), 305 B.R. 472, 475 (B.A.P. 8th Cir. 2004) (emphasis in original) (citations omitted). As one court explained:

> When a corporation is a bona fide entity distinct from an individual debtor-shareholder, courts have applied the above-stated principle to hold that transfers of property belonging to the corporation are outside the scope of section 727(a)(2)(A). . . . Most courts considering whether a transfer of corporate property supports denial of discharge in an individual debtor's case have concluded it does not. Even though a debtor may have caused a corporation to fraudulently transfer assets, that conduct does not support denial of discharge because the debtor has not transferred his own property.

Spitko, 357 B.R. at 299 (citing and quoting In re Cassis, 220 B.R. 979, 983–84 (Bankr. N.D. Iowa 1998)); see also In re Bilbo, 2014 WL 689097, at *6 (Bankr. N.D. Ga. Feb. 5, 2014) (explaining the court should "respect the corporation as an entity, distinct from the debtor").

Transfers of property belonging to the corporation RRJ are outside the scope of section 727(a)(2)(A). In re Chu, 511 B.R. 681, 686 (Bankr. D. Haw. 2014) (the statute requires the

transferred property be "property of the debtor"). Even if Defendant caused RRJ to fraudulently transfer assets, that conduct does not support denial of discharge because Defendant did not transfer her own property. See Spitko, 357 B.R. at 299. Plaintiff alleges Defendant caused RRJ to dispose of non-car business assets such as washers and dryers, vacuum cleaners, office furniture and supplies, and the like, as set out above. These transfers of RRJ's property do not form a basis to bar Defendant's discharge under section 727(a)(2).

As to the cars, the parties do not dispute that Wild Rose sold them to RRJ. The record shows that the Defendant individually sold three of the cars to CarMax shortly before the bankruptcy filing. The Court has held above that there is a question of material fact as to whether Plaintiff held a security interest in the cars. But the record contains no title information and no information as to when or how the cars came to be sold by Defendant. If the three cars were in fact property of RRJ when they were sold, their sale cannot form a basis for objecting to Defendant's discharge under section 727(a)(2). If the cars were property of the Defendant when they were sold, the Plaintiff must still point to evidence in the record to show Defendant sold the cars with intent to hinder, delay, or defraud a creditor or the trustee but that creditor must be of the debtor, not the company. "A creditor alleging intent to defraud under § 727(a)(2)(A) bears the considerable burden of demonstrating *actual fraudulent intent;* constructive fraud is insufficient. In re Wall, 2008 WL 8792259, at *4 (Bankr. S.D. Ga. Mar. 31, 2008). Here, the only allegation is that Defendant used the proceeds from the sale of the cars to pay business debt and personal debt. Using proceeds to pay debt is not fraudulent as to the Trustee or Defendant's creditors in general. Miller, 39 F.3d at 307 (motivation in effecting the transfer was to obtain funds to keep their businesses alive while satisfying their largest creditor, and a mere preferential transfer is not tantamount to a fraudulent transfer for the purposes of denying discharge). Defendant did not take

the money and go on a trip or buy a car or house or other assets. Instead, she used it to pay debts. Moreover, the three cars were sold to a disinterested third party in the business of buying cars, and Plaintiff has not challenged the value obtained for the cars (which is only about $2,000 less than the value assigned three years prior). As discussed above, the use of the sales proceeds may provide a basis to find Plaintiff's <u>claim</u> nondischargeable, but it does not provide a basis for denying Defendant a discharge completely. <u>See</u> <u>In re Ham</u>, 174 B.R. 104, 107–08 (Bankr. S.D. Ill. 1994) (explaining when a creditor objects to the discharge of the debtor pursuant to section 727, it is seeking to hold all of the debtor's debts nondischargeable because of "objectionable conduct" by the debtor that is "more pervasive than a fraud on, or injury to, a single creditor.").

Finally, Plaintiff has pointed to no evidence in the record as to the ownership or disposition of the car that was "totaled" by an employee, or the date of any alleged transfer. This allegation alone suggests the car was property of RRJ and not the Defendant. When a motion for summary judgment is filed, Plaintiff, as the party with the burden of proof, must come forward with some evidence that the car was property of the Defendant and transferred within a year of the bankruptcy case. In the absence of such evidence, the Court grants Defendant summary judgment that the disposition of this totaled car provides any basis for denying Defendant a discharge. Summary judgment is granted to Defendant on any claims under section 727(a)(2).

### B.  727(a)(3)

Section 727(a)(3) of the Bankruptcy Code provides a debtor must provide, maintain, and preserve adequate records. Section 727(a)(3) states:

> The court shall grant the debtor a discharge, unless—
>
>> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained,

> unless such act or failure to act was justified under all of the
> circumstances of the case[.]

11 U.S.C. § 727(a)(3). The policy underlying section 727(a)(3) is to ensure the trustee and the

creditors receive sufficient information to effectively enable them "to trace the debtor's financial

history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business

transactions." Krohn v. Frommann (In re Frommann), 153 B.R. 113, 116 (Bankr. E.D.N.Y. 1993)

(internal citations omitted). To construct a *prima facie* case under section 727(a)(3), the creditor

objecting to discharge must show (1) the debtor failed to provide, maintain, and preserve adequate

records, and (2) such failure makes it impossible to ascertain the debtor's financial condition and

material business transactions. Meridian Bank v. Alten, 958 F.2d 1226, 1232 (3d Cir. 1992); see

also Butler v. Liu (In re Liu), 288 B.R. 155, 161 (Bankr. N.D. Ga. 2002). If the creditor satisfies

his burden on these factors, the burden of proof then shifts to the debtor to justify the inadequacy

or nonexistence of the records. Lansdowne v. Cox (In re Cox), 41 F.3d 1294, 1297 (9th Cir. 1994);

Meridian Bank, 958 F.2d at 1230–31 .

The Bankruptcy Code does not require a debtor seeking a discharge to maintain any

specific documents, nor does it require an impeccable system of bookkeeping. Meridian Bank, 958

F.2d at 1230; In re Decker, 595 F.2d 185, 187 (3d Cir. 1979). Whether a debtor's records are

sufficient is within the court's discretion, and courts will not deny a debtor his discharge simply

because a plaintiff does not like that books or records were kept in a certain way. See Mercantile

Peninsula Bank v. French (In re French), 499 F.3d 345, 354–55 (4th Cir. 2007) (explaining perfect

records are not required); see also Chaudhry v. Usoskin (In re Usoskin), 56 B.R. 805 (Bankr.

E.D.N.Y. 1985). Even if a debtor keeps no books, the debtor should receive a discharge if the

debtor's financial condition and business transactions can be ascertained from available records. 6

Collier on Bankruptcy P 727.03[3][c].

The burden is on the plaintiff to point to specific records that were not kept and to demonstrate why such records were necessary to ascertain the debtor's financial affairs. Robertson v. Dennis (In re Dennis), 330 F.3d 696, 703 (5th Cir. 2003); Cox, 41 F.3d at 1296 (it is the creditor's burden to show the debtor failed to maintain and preserve adequate records). A court will not deny a debtor a discharge where the plaintiff fails to identify missing documents. Barristers Abstract Corp. v. Caulfield (In re Caulfield), 192 B.R. 808 (Bankr. E.D.N.Y. 1996). For example, in Olympic Coast Inv., Inc. v. Wright (In re Wright), 364 B.R. 51 (Bankr. D. Mont. 2007), the creditor stated in conclusory fashion the debtors' documents were inadequate. The bankruptcy court concluded the creditor failed to satisfy its burden to show the debtors failed to keep and preserve adequate business records; the district court agreed. It was the creditor's burden to show the debtors' records did not suffice, and the creditor failed to offer any evidence and argument on the point. Olympic Coast Inv., Inc. v. Wright (In re Wright), 2008 WL 160828 (D. Mont. Jan. 15, 2008), aff'd 340 Fed. Appx. 422, 423–424 (9th Cir. 2009).

Here, Plaintiff has not pointed to specific records that were not kept and has not demonstrated why such records were necessary to ascertain Defendant's financial affairs. The only allegation in the Complaint is that Defendant may not have kept sufficient records. This allegation provides no basis to deny Defendant a discharge under section 727(a)(3), so Defendant is granted summary judgment on this claim.

### C.  727(a)(4)

Under section 727(a)(4)(A), the Court will not grant a discharge if it finds that the "debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account." 11 U.S.C. § 727(a)(4)(A). Under section 727(a)(4), a plaintiff must prove:

1)     the debtor made a statement under oath,

41

2)      the statement was false,

3)      the debtor knew the statement was false,

4)      the debtor made the statement with fraudulent intent, and

5)      the statement related materially to the bankruptcy case.

In re Roubieu, 2005 WL 6459370 (Bankr. N.D. Ga. July 6, 2005). Detriment to creditors need not

be shown. Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984) (citation

omitted).

First, the statement at issue must have been made under oath. A debtor's statements and

schedules are executed under oath and penalty of perjury. Fed. R. Bankr. P. 1008; Official Form 1

(Voluntary Petition); Official Form 7 (Statement of Financial Affairs); see also Beaubouef v.

Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992). Likewise, statements made at a

debtor's section 341 meeting of creditors are made under oath. 11 U.S.C. § 343 ("The debtor shall

appear and submit to examination under oath at the meeting of creditors under section 341(a) of

this title."); Fed. R. Bankr. P. 2003(c); In re Heil, 289 B.R. 897, 907–08 (Bankr. E.D. Tenn. 2003).

"A deliberate omission may constitute a false oath." In re Reynolds, 2015 WL 6520157, at *5

(Bankr. N.D. Ga. Sept. 18, 2015) (citing Phillips v. Epic Aviation (In re Phillips), 476 Fed. Appx.

813, 816 (11th Cir. 2012)).

Second, the statement must be material. A false statement is material if "it bears a

relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets,

business dealings, or the existence and disposition of his property." Chalik, 748 F.2d at 618

(citation omitted). A debtor "is not permitted to decide to omit an asset because the debtor believes

it lacks value." In re Heil, 289 B.R. at 908 (citation omitted). A debtor is charged with answering

the questions accurately and completely and is obligated to disclose even worthless assets. See In

42

re Tylee, 512 B.R. 409, 416–17 (Bankr. E.D.N.Y. 2014). "[W]hile the omission of worthless assets may be material, the value of the asset omitted may be evidence of the debtor's intent, or lack thereof, to deceive." White, 568 B.R. at 913 (citation omitted).

Third, the debtor must know the statement was false. "A debtor knows their statement is false when he or she 'knew the truth, but nonetheless failed to give the information or gave contradicting information.'" In re Christian, 615 B.R. 240, 247–48 (Bankr. M.D. Tenn. 2020) (citation omitted).

Fourth, the debtor must make the statement with fraudulent intent. Fraudulent intent involves a material representation that a debtor knows to be false or an omission the debtor knows will create an erroneous impression. In re Heil, 289 B.R. at 908 (citation omitted). "Proving that a debtor's actions were taken knowingly and with fraudulent intent is not a simple matter, for it is rare that one will willingly provide direct evidence of fraudulent intent." In re Franco, 600 B.R. 355, 359 (Bankr. S.D. Tex. 2019). "[A]ctual intent may be inferred from circumstantial evidence[,]" including course of conduct. White, 568 B.R. at 913 (citation omitted); Lightfoot v. Landry (In re Landry), 350 B.R. 51, 59 (Bankr. E.D. La. 2006) (citation omitted). Further, "a reckless indifference to the truth is sufficient to constitute the requisite fraudulent intent for denying a discharge under section 727". In re White, 568 B.R. at 913 (citation omitted). But a mere suspicion is insufficient to demonstrate the intent required by section 727(a)(4). See In re Strauss, 2017 WL 4224090 (N.D. Ga. June 15, 2017).

A series or pattern of errors or omissions may indicate fraudulent intent, however. Franco, 600 B.R. at 360 (citing The Cade Company v. Guenther (In re Guenther), 333 B.R. 759, 767–68 (Bankr. N.D. Tex. 2005)). "While multiple inaccuracies are usually evidence of a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent

intent", Landry, 350 B.R. at 59–60, a single instance, or a few minor instances, are often the result of an innocent mistake and generally insufficient for finding fraudulent intent. Christian, 615 B.R. at 248; see also Franco, 600 B.R. at 360 (mistakes per se not enough to bar a discharge). A debtor's ready disclosure when questioned will also weigh against a finding of intent. Christian, 615 B.R. at 248. Courts generally find a debtor's willingness to acknowledge his mistake and amend his schedules and/or report an omission or mistake is inconsistent with the intent to defraud. Kovacs v. McVay (In re McVay), 363 B.R. 824 (Bankr. N.D. Ohio 2006).

Plaintiff has not proved Defendant knowingly and with fraudulent intent made a false statement under oath that related materially to her bankruptcy case as required under section 727(a)(4). Plaintiff has not identified any false oath. The record shows Defendant disclosed the transfers in the SOFA, including identities of some of the purchasers and the amounts obtained, and the location of the storage unit in which the remaining items were stored. Since Plaintiff bears the burden of proof, he must point to the specific evidence of false oaths. There are no facts demonstrating Defendant made a false oath, let alone a false oath with the requisite intent, so summary judgment is granted to Defendant on this claim.

### D.  Section 727(a)(5)

Under section 727(a)(5), bankruptcy courts have "broad power to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets." In re D'Agnese, 86 F.3d 732, 734 (7th Cir. 1996) (internal citation omitted). For a debtor's discharge to be denied under section 727(a)(5), "a plaintiff must establish that the debtor at one time owned a substantial identifiable asset, not too remote in time to the date of the commencement of the case; that on the date of filing the bankruptcy petition the debtor no longer had the particular asset; and that the debtor was unable to furnish a satisfactory explanation for the non-existence of

44

the asset when called upon to do so." In re Walden, 380 B.R. 883, 894 (Bankr. M.D. Fla. 2008) (emphasis added); see also In re Breedlove, 545 B.R. 359, 379 (Bankr. M.D. Ga. 2016).

The "creditor has the initial burden to establish that there has been a loss or disappearance of assets [after which] the burden shifts to the debtor to satisfactorily explain the loss of assets." In re Hudgens, 149 Fed. Appx. 480, 487 (7th Cir. 2005). A "satisfactory explanation" of the loss of assets "must consist of more than . . . vague, indefinite, and uncorroborated" assertions by the debtor. D'Agnese, 86 F.3d at 734. But a debtor is only required to describe what happened to the assets, and is not required to show that the disposition was proper. White, 568 B.R. at 914; O'Steen, 581 B.R. at 673–74. Section 727(a)(5) is not "concerned with the wisdom of [the] debtor's disposition of assets, but is concerned with the truth, detail and completeness of the debtor's explanation of the loss." Spirk v. Sullivan, 2003 WL 22048077 (N.D. Ill. Aug. 28, 2003) (citing D'Agnese, 86 F.3d at 735). While documentary support for an explanation is preferred, there is "no bright line rule . . . that a debtor must . . . always present documentation whenever a creditor establishes a loss of assets." Hudgens, 149 Fed. Appx. at 488. As long as a debtor's "explanation convinces the judge that the debtor has not hidden or shielded assets, corroborating evidence by way of documentation is not necessary in every instance." D.A.N. Joint Venture v. Cacioli (In re Cacioli), 463 F.3d 229, (2d Cir. 2006) (quoting Krohn v. Cromer (In re Cromer), 214 B.R. 86, 97 (Bankr. E.D.N.Y. 1997)).

Here, the assets of which Plaintiff complains are assets of RRJ (inventory, supplies, vacuums, washers, and dryers, and a totaled car). The loss of these assets does not support denial of Defendant's discharge because they were not Defendant's property. See In re Jarrell, 129 B.R. 29, 34 (Bankr. D. Del. 1991); see also In re Kyung S. Song, 449 B.R. 84, 103 (Bankr. N.D. Cal. 2011). In any event, she has adequately explained the disposition of these corporate assets. The

propriety of the disposition is not an issue under section 727(a)(5). Similarly, to the extent any of the Kia Souls are property of the Defendant, she has adequately explained their disposition. Whether Defendant properly sold the cars is not an issue for determination under section 727(a)(5). Summary judgment is granted to Defendant on this claim.

## V.   CONCLUSION

Plaintiff seeks to have his entire contractual debt determined to be nondischargeable and/or to deny Defendant a discharge, but the undisputed facts do not support either of these demands. Instead, the only remaining issue for trial is whether the disposition of the four Kia Souls gives rise to a claim against Defendant and, if so, whether that claim is nondischargeable. Importantly, any such claim will be limited to the value of the cars. It is therefore **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** as to:

1) All the allegations and Plaintiff's claim under all subsections of section 727;

2) All allegations of fraud in the inducement;

3) All allegations regarding Defendant's failure to obtain life insurance on Mr. Cadenhead;

4) All allegations that the entire amount due under the guaranty is nondischargeable;

5) All allegations that Defendant is liable to Plaintiff for disposal of RRJ's non-car property, and such claim is nondischargeable.

**IT IS FURTHER ORDERED** that summary judgment is **DENIED** as to whether the Defendant is liable for the disposition of the four Kia Souls and, if so, the value of the property and whether such claim is nondischargeable under section 523(a)(2)(A) or 523(a)(4).

## <u>END OF ORDER</u>

**<u>Distribution List</u>**

Michael Smithyman
5060 Hickory Hills Dr.
Woodstock, GA 30188

Shannan Collier Stalvey
The Law Office of Shannan S. Collier, PC
100 Galleria Parkway, Suite 1010
Suite 1010
Atlanta, GA 30339

Judy Dawn Crawford
502 Oriole Farm Trl
Canton, GA 30114

Jeffrey B. Kelly
Law Office of Jeffrey B. Kelly, P.C.
107 E. 5th Avenue
Rome, GA 30161